539 A.2d 637

**Jackie Kevin HARRIS**

v.

**STATE of Maryland.**

**No. 30, Sept. Term, 1987.**

Court of Appeals of Maryland.

April 5, 1988.

Cole, J., filed concurring opinion.

McAuliffe, J., filed concurring opinion in which Black-well, J., joined in part.

228

230

Michael R. Braudes, Asst. Public Defender (Alan H. Murrell, Public Defender, George E. Burns, Jr., Jose F. Anderson and Nancy S. Forster, Asst. Public Defenders, on the brief), Baltimore, for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on the brief), Baltimore, for appellee.

Argued before MURPHY, C.J., and ELDRIDGE, COLE, RODOWSKY, McAULIFFE, ADKINS and BLACKWELL, JJ.

ADKINS, Judge.

This is appellant Jackie Kevin Harris's fifth visit to this Court since his 1982 convictions, after pleas of guilty, of first degree murder, armed robbery, and use of a hand-

gun in the commission of a crime of violence, and his subsequent death sentence. That death sentence has twice been reimposed.[1] From the latest reimposition Harris now appeals advancing 11 arguments for the invalidity of his current death sentence or the illegality of a new sentencing hearing, and one relating to his original plea of guilty.[2]

---

1. In *Harris v. State*, 295 Md. 329, 455 A.2d 979 (1983) (*Harris I*), we affirmed Harris's conviction but vacated the death sentence. After he was resentenced to death we vacated and remanded for the circuit court to decide Harris's motion to withdraw his guilty pleas and to review whether he had been denied effective assistance of counsel in connection with the guilty pleas. *Harris v. State*, 299 Md. 511, 474 A.2d 890 (1984) (*Harris II*). That claim of ineffective assistance of counsel we rejected in *Harris v. State*, 303 Md. 685, 496 A.2d 1074 (1985) (*Harris III*). In the same decision, however, we requested supplemental briefs bearing on Harris's second sentencing hearing. In *Harris v. State*, 306 Md. 344, 509 A.2d 120 (1986) (*Harris IV*), we vacated the second death sentence because Harris had been denied his right of allocution. In March 1987, after a further sentencing hearing, Harris was again sentenced to death.

2. For preservation purposes, Harris again raises the issue of inadequate representation in connection with the entry of his guilty pleas in 1982. We decided this question adversely to him in *Harris III*, and shall not address it now. Another issue we need not address at length has to do with the trial court's allegedly unconstitutional allocation of burdens of proof. We rejected an identical claim in *Foster v. State*, 304 Md. 439, 476–480, 499 A.2d 1236, 1255–1257 (1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). We adhere to the views there expressed. Nor need we consider Harris's assertions as to the disproportionality of the death sentence as imposed on him. There will be an opportunity to do that if Harris is again sentenced to death. Additionally, Harris questions the propriety of certain jury arguments made by the State at sentencing. Because those arguments might not be made at a new sentencing hearing, we shall not address them. We call attention to the oft-cited principles laid down in *Wilhelm v. State*, 272 Md. 404, 413–431, 326 A.2d 707, 714–724 (1974). *See also Jones v. State*, 310 Md. 569, 580–581, 530 A.2d 743, 748–749 (1987); *State v. Calhoun*, 306 Md. 692, 717–718, 511 A.2d 461, 473–474 (1986); *Booth v. State*, 306 Md. 172, 199–209, 215–216, 507 A.2d 1098, 1112–1117, 1120 (1986), *vacated on other grounds*, 482 U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). With special reference to prosecutorial comment on the demeanor of a non-testifying defendant at sentencing, we observe that argument of this sort has been permitted under some circumstances, *State v. Brown*, 320 N.C. 179, ——, 358 S.E.2d 1, 14–15 (1987), but should be allowed only through the most cautious exercise of discretion, keeping in mind that outward demean-

The principal issue on this appeal has to do with the use of victim impact statements at Harris's most recent sentencing hearing. The use of those statements requires us to vacate the death sentence imposed in 1987. *Booth v. Maryland,* 482 U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). After discussing that dispositive issue, we shall nevertheless examine a number of Harris's other contentions. Some of them, should we accept them, would bar further proceedings (Parts II and III of this opinion). Others we discuss chiefly to guide the trial court at the resentencing proceeding that we shall order (Part IV).

### I. *The Victim Impact Statements*

In *Booth,* the Supreme Court held that the use of a victim impact statement (VIS) during the sentencing phase of a capital murder case violated the eighth amendment's prohibition against cruel and unusual punishment.[3] The VIS at issue in *Booth* was thus depicted by the Supreme Court:

> The VIS in this case provided the jury with two types of information. First, it described the personal characteristics of the victims and the emotional impact of the crimes on the family. Second, it set forth the family members' opinions and characterizations of the crimes and the defendant.

482 U.S. at ——, 107 S.Ct. at 2533, 96 L.Ed.2d at 448. The Court analyzed each of the two types of victim impact information separately, finding that either one standing alone would be inadmissible at a capital sentencing proceeding.

In its discussion of the parts of the VIS dealing with the emotional impact of the crime on family members, the Court noted that "it is the function of the sentencing jury to

---

or does not always accurately reflect one's underlying mental state. *Hughes v. State,* 437 A.2d 559, 572 (Del.1981).

**3.** The eighth amendment is applicable to the states through the fourteenth amendment. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962).

'express the conscience of the community on the ultimate question of life or death,' " 482 U.S. at ——, 107 S.Ct. at 2533, 96 L.Ed.2d at 449 (quoting *Witherspoon v. Illinois*, 391 U.S. 510, 519, 88 S.Ct. 1770, 1775, 20 L.Ed.2d 776, 783 (1968)), and that "[w]hen carrying out this task the jury is required to focus on the defendant as a 'uniquely individual human bein[g].' " 482 U.S. at ——, 107 S.Ct. at 2533, 96 L.Ed.2d at 449 (quoting *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 2990, 49 L.Ed.2d 944, 961 (1976)). One of the principal problems with the VIS in *Booth*, according to the Court, was that its focus was "not on the defendant, but on the character and reputation of the victim and the effect on his family." 482 U.S. at ——, 107 S.Ct. at 2534, 96 L.Ed.2d at 449. This, the Court found, "creates an impermissible risk that the capital sentencing decision will be made in an arbitrary manner."[4] 482 U.S. at ——, 107 S.Ct. at 2534, 96 L.Ed.2d at 450. Consequently, the Court found the VIS inadmissible.

The Court found the admissions of portions of the VIS offering the victims' opinions and characterizations of the crime inadmissible for similar reasons. In this regard Justice Powell, for the Court, concluded that "[t]he admission of these emotionally-charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decisionmaking [*sic*] we require in capital cases." 482 U.S. at ——, 107 S.Ct. at 2536, 96 L.Ed.2d at 452. With these teachings of *Booth* in mind, we turn to the case before us.

At the sentencing phase of Harris's trial, the State introduced separate VISs from Frances R. Hviding and William

---

**4.** It is well settled that capital sentencing decisions rendered in an arbitrary manner are violative of the United States Constitution's eighth amendment prohibition against cruel and unusual punishment. *See Booth v. Maryland*, 482 U.S. at ——, 107 S.Ct. at 2532, 96 L.Ed.2d at 448; *California v. Ramos*, 463 U.S. 992, 999, 103 S.Ct. 3446, 3452, 77 L.Ed.2d 1171, 1179 (1983); *Gregg v. Georgia*, 428 U.S. 153, 189, 96 S.Ct. 2909, 2932, 49 L.Ed.2d 859, 883 (1976) (joint opinion of Stewart, Powell and Stevens, JJ.).

L. Hviding, Jr., the mother and brother, respectively, of the murder victim, Stephen Hviding. This action occurred before the Supreme Court's *Booth* had barred the use of the VIS generally authorized by Md. Code (1986 Repl.Vol., 1987 Cum.Supp.) Art. 41, § 4–609, in capital sentencing proceedings. It was seemingly appropriate in view of the statute and of our decision, now vacated, in *Booth v. State,* 306 Md. 172, 507 A.2d 1098 (1986), *vacated,* 482 U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *but see* Cole, J., dissenting, 306 Md. at 230–241, 507 A.2d at 1128–1133.

In her VIS Frances Hviding elaborated on the negative impact of Stephen's death upon her own emotional well being; that of the other family members who did not prepare VISs; and on her husband's physical and mental health. Mrs. Hviding's VIS, however, expressed no opinion as to the nature of the crime or on Harris's character.

William Hviding discussed the same sorts of things—his own personal grief; a persistent fear of being murdered; and the failing family business,—all of which he attributed to his brother Stephen's murder. But William's VIS did not stop there. He ventured on to express opinions concerning the crime itself. These opinions are contained in the following excerpt from his VIS:

> My little brother did not just die. Stephen was brutally and intentionally shot in the chest until he fell to the floor and died.
>
> Take a moment to think about your closest friend or relative being murdered. Your mother falls to the ground bleeding profusely, gasping for air after being shot repeatedly by an armed robber. Picture the look on her face as she stops moving and breathing.

█ The Hviding VISs were both clearly inadmissible under *Booth* for the simple reason that each impermissibly focused on "the victim and the effect on his family," rather than on the accused. *Booth,* 482 U.S. at ——, 107 S.Ct. at 2534, 96 L.Ed.2d at 449. William Hviding's VIS was inadmissible for the additional reason that in it he commented

upon the nature of the crime itself. The State concedes as much. But it insists that the error was harmless because, according to it, the prejudicial aspect of a VIS is limited to its impact on the process of weighing mitigating against aggravating factors. Since no mitigating factors were found in this case, we are told there was no weighing to be done. Thus, concludes the State, introduction of the VISs could not have prejudiced Harris. We disagree.

In emphasizing that a capital sentencing proceeding must focus on the crime and the defendant, the Supreme Court held that victim impact information relating to the trauma suffered by the victim's family and the personal characteristics of the victims is simply irrelevant because it tells us nothing about the defendant or his or her blameworthiness. *Booth*, 482 U.S. at ——————, 107 S.Ct. at 2533–2534, 96 L.Ed.2d at 448–450. As to information concerning family members' perceptions of the crimes, it could "serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." 482 U.S. at ——, 107 S.Ct. at 2536, 96 L.Ed.2d at 452. Thus, the Supreme Court's reasons for excluding a VIS were not, for the most part, based on any concern with Maryland's weighing process. The Court did not even discuss the possibility of harmless error but rested on the notion that VISs like those in *Booth* are prejudicial because of their inflammatory nature.

If, however, we apply a harmless error analysis based on Maryland's weighing process, we reach the same result because the State is wrong about the nature of that process. It occurs even when none of the seven specific statutory mitigating factors is present, for " '[i]f the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance, and decide that it outweighs the aggravating circumstances.' " *Mills v. State*, 310 Md. 33, 51, 527 A.2d 3, 11–12, *cert. granted*, —— U.S. ——, 108 S.Ct. 484, 98 L.Ed. 2d 483 (1987) (quoting *Foster v. State*, 304 Md. 439, 475, 499

A.2d 1236, 1254 (1985), *cert. denied*, 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986)). It is apparent that the VISs introduced in this case might have had an improperly prejudicial effect on this process. We reject the State's harmless error argument.

## II. *Permissibility of Multiple Resentencing*

Harris points out that upon remand, he will undergo capital sentencing for the fourth consecutive time. Repeatedly subjecting him to resentencing, Harris argues, violates the doctrines of cruel and unusual punishment,[5] due process, and double jeopardy.[6] He asks that we vacate his death sentence and impose a life sentence instead of remanding for resentencing. We are prepared to assume that the State cannot continue to resentence Harris indefinitely, and that there will come a day when further sentencing hearings will be constitutionally impermissible. That day, however, has not yet arrived. We explain.

### A. Double Jeopardy

Harris maintains that the State's conduct throughout his last three capital sentencings amounted to prosecutorial overreaching. Because of this asserted overreaching and the psychological trauma caused by multiple sentencings, a fourth sentencing is barred by the double jeopardy clause,

---

5. Harris relies upon both Article 25 of the Maryland Declaration of Rights and the eighth amendment to the United States Constitution. But since the eighth amendment is *in pari materia* with Article 25, we need not engage in separate discussions of these provisions. *Walker v. State*, 53 Md.App. 171, 183, 452 A.2d 1234, 1240 (1982), *cert. denied*, 296 Md. 63 (1983). *See Stebbing v. State*, 299 Md. 331, 373, 473 A.2d 903, 924, *cert. denied*, 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984); *Colvin v. State*, 299 Md. 88, 120–126, 472 A.2d 953, 969–972, *cert. denied*, 469 U.S. 873, 105 S.Ct. 226, 83 L.Ed.2d 155 (1984); *Calhoun v. State*, 297 Md. 563, 602–606, 468 A.2d 45, 63–64 (1983), *cert. denied*, *Tichnell v. Maryland*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Tichnell v. State*, 287 Md. 695, 728–729, 415 A.2d 830, 848 (1980).

6. Harris's due process and double jeopardy claims are based solely upon the applicable provisions of the United States Constitution.

runs his argument. We analyze the problem from a different perspective.

■ The fifth amendment's double jeopardy clause, applicable to the states through the fourteenth amendment, *Benton v. Maryland,* 395 U.S. 784, 795–796, 89 S.Ct. 2056, 2062–2063, 23 L.Ed.2d 707, 716–717 (1969), "protects a criminal defendant from repeated prosecutions for the same offense." *Oregon v. Kennedy,* 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416, 422 (1982). The protection afforded by the double jeopardy clause not only applies to the guilt phase of trial, but under some circumstances to the sentencing phase as well. *Bullington v. Missouri,* 451 U.S. 430, 446, 101 S.Ct. 1852, 1862, 68 L.Ed.2d 270, 283–284 (1981).

■ *Bullington* is instructive in this regard. There, a defendant in a capital case was sentenced to life imprisonment at a sentencing hearing that involved procedures quite similar to those employed in Harris's case. 451 U.S. at 432–436, 101 S.Ct. at 1855–1856, 68 L.Ed.2d at 275–276. Later, the defendant's motion for new trial was granted, and the State again sought the death penalty. The Supreme Court held that the State's attempt to do so was barred by double jeopardy. 451 U.S. at 446, 101 S.Ct. at 1862, 68 L.Ed.2d at 283–284. In its analysis, the Court pointed out that a capital sentencing procedure like that used in *Bullington* was substantially similar to a criminal trial on the issue of guilt or innocence. At the sentencing hearing, the prosecution

> undertook the burden of establishing certain facts beyond a reasonable doubt in its quest to obtain the harsher of the two alternative verdicts. The presentencing hearing resembled and, indeed, in all relevant respects was like the immediately preceding trial on the issue of guilt or innocence. It was itself a trial on the issue of punishment....

451 U.S. at 438, 101 S.Ct. at 1858, 68 L.Ed.2d at 278–279 [footnote omitted].

The Court then pointed to the normal rule that double jeopardy does not bar the retrial of a defendant who has succeeded in overturning his conviction. *See, e.g., North Carolina v. Pearce,* 395 U.S. 711, 719–720, 89 S.Ct. 2072, 2077–2078, 23 L.Ed.2d 656, 666 (1969); *United States v. Tateo,* 377 U.S. 463, 465, 84 S.Ct. 1587, 1589, 12 L.Ed.2d 448, 450 (1964); *United States v. Ball,* 163 U.S. 662, 671–672, 16 S.Ct. 1192, 1195, 41 L.Ed 300, 303 (1896). That is because "the original conviction has been nullified and 'the slate wiped clean.' " *Bullington,* 451 U.S. at 442, 101 S.Ct. at 1860, 68 L.Ed.2d at 281 (quoting *Pearce,* 395 U.S. at 721, 89 S.Ct. at 2078, 23 L.Ed.2d at 667). But it went on to explain that the normal rule is subject to an exception: a defendant who obtains a reversal of a conviction on the ground of insufficiency of the evidence may not be retried. 451 U.S. at 442–443, 101 S.Ct. at 1860, 68 L.Ed.2d at 281 (citing *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978)). When the prosecution has failed to prove its case at the first trial, the "clean slate" rule does not apply.

In the context of a capital sentencing hearing, the *Bullington* Court viewed the sentence of life imprisonment as tantamount to an acquittal for insufficiency of evidence. Thus, it invoked double jeopardy and prohibited a new capital sentencing hearing because the State, "[h]aving received 'one fair opportunity to offer whatever proof it could assemble,' ... [was] not entitled to another." *Bullington,* 451 U.S. at 446, 101 S.Ct. at 1862, 68 L.Ed.2d at 283–284 (quoting *Burks v. United States,* 437 U.S. at 16, 98 S.Ct. at 2150, 57 L.Ed.2d at 13) (citations omitted).

As we have noted, the capital sentencing procedure described in *Bullington* is like that used in the case before us. It is a procedure that closely resembles a criminal trial. As a consequence, *Bullington* would be dispositive had Harris received a life sentence. But he did not; the jury sentenced him to death. That result cannot be equated to an acquittal in the double jeopardy calculus, nor can the vacating of that sentence on *Booth* grounds be treated as the functional

equivalent of a reversal of a conviction for insufficient evidence. As a consequence the rule of *Bullington* is inapplicable; the "clean slate" rule of *Ball* and its progeny is. *See Tichnell v. State*, 297 Md. 432, 440, 468 A.2d 1, 5 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846, *reh'g denied*, 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984); *Jones v. State*, 288 Md. 618, 625, 420 A.2d 1241, 1244 (1980), *cert. denied*, 449 U.S. 1115, 101 S.Ct. 928, 66 L.Ed.2d 845 (1981); *Sweetwine v. State*, 288 Md. 199, 204, 421 A.2d 60, 63, *cert. denied*, 449 U.S. 1017, 101 S.Ct. 579, 66 L.Ed.2d 477 (1980), *habeas corpus, Sweetwine v. Maryland*, 769 F.2d 991 (4th Cir.1985), *cert. denied*, 475 U.S. 1021, 106 S.Ct. 1209, 89 L.Ed.2d 322 (1986); *Parks v. State*, 287 Md. 11, 16, 410 A.2d 597, 601 (1980) (discussing the "clean slate" rule). Harris having been successful in his efforts to clean the sentencing slate, double jeopardy does not bar the State from seeking, once again, the death penalty.[7]

### B. Cruel and Unusual Punishment

■ Harris asserts that "yet another capital sentencing hearing would constitute cruel and unusual punishment" in violation of the United States Constitution's eighth amendment and Article 25 of the Maryland Declaration of Rights. Brief at 15. In support of this contention, Harris argues

---

**7.** Harris argues that double jeopardy should bar further efforts to seek the death penalty because of what he sees as an analogy to certain principles regarding retrial after a mistrial. Ordinarily, when the defendant seeks or consents to a mistrial, double jeopardy imposes no bar to a retrial. But if the prosecution has intentionally goaded the defendant into requesting a mistrial, or deliberately and improperly tried to harm the defendant's prospects for acquittal, a defense-sought mistrial may raise the bar of double jeopardy. *Oregon v. Kennedy*, 456 U.S. 667, 672–676, 102 S.Ct. 2083, 2087–2090, 72 L.Ed.2d 416, 422–425 (1982); *Booth v. State*, 301 Md. 1, 4–6, 481 A.2d 505, 506–507 (1984); *Tichnell v. State*, 297 Md. 432, 439–441, 468 A.2d 1, 5 (1983), *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *Cornish v. State*, 272 Md. 312, 318–320, 322 A.2d 880, 884–886 (1974). Even if the analogy is appropriate, the record in this case does not disclose the sort of intentional, outrageous, and egregious conduct on the part of the State that would make double jeopardy applicable in the mistrial context.

that the unnerving strain induced by the numerous death penalty hearings constitutes a penalty so severe that further proceedings would amount to cruel and unusual punishment.

Since this is an issue of first impression in Maryland, we must look to other courts for guidance. Most, if not all, of the courts that have addressed this issue have been reluctant to find that successive retrial of an accused constitutes cruel and unusual punishment. *See United States v. Persico*, 425 F.2d 1375, 1384–1385 (2d Cir.1970) (five trials coupled with a delay of two and one-half years following reversal of the fourth trial did not amount to cruel and unusual punishment in a non-capital case); *Purvis v. California*, 234 F.Supp. 147, 151 (N.D.Cal.1964) (fourth trial in a capital case did not amount to cruel and unusual punishment even though court noted that "[a]s a general proposition having to sit through a trial may be an onerous burden for a defendant ...."); *People v. Terry*, 70 Cal.2d 410, 418, 77 Cal.Rptr. 460, 465–466, 454 P.2d 36, 41–42 (1969) (while pointing out "that there is a constitutional limit to the number of times a man must undergo a trial where his life is at stake, ..." the court found that a capital defendant's fifth trial did not subject him to cruel and unusual punishment); *Weatherford v. State*, 164 Ind.App. 340, 343–344, 328 N.E.2d 756, 758 (1975) (third trial of non-capital defendant did not amount to cruel and unusual punishment), *overruled on other grounds, Holland v. State*, 265 Ind. 216, 352 N.E.2d 752 (1976); *People v. Kirby*, 112 Misc.2d 906, 908, 447 N.Y.S.2d 606, 607 (1982), *rev'd on other grounds*, 92 A.D.2d 848, 460 N.Y.S.2d 572 (1983) (fourth trial in a non-capital case was not cruel and unusual punishment since "reprosecution after the declaration of a mistrial is not punishment in any constitutional sense").

Though we acknowledge, as did the court in *People v. Terry, supra,* that having to undergo four successive capital sentencings is an "onerous burden" for Harris, that burden does not in and of itself amount to cruel and

unusual punishment proscribed by the eighth amendment and our Article 25.

### C. Due Process

Finally Harris argues in a single paragraph that a fourth capital sentencing proceeding would violate his due process rights. This too is an issue of first impression in Maryland. Other courts confronting this question have held that a fourth retrial is not barred on due process grounds. *See Ex Parte Anderson*, 457 So.2d 435, 443–445 (Ala.Crim.App.1984); *People v. Cummings*, 47 Ill.App. 3d 578, 581, 5 Ill.Dec. 944, 946, 362 N.E.2d 415, 417 (1977) (holding "that the number of trials is not a violation of due process unless it also places the defendant in double jeopardy"); *People v. Thompson*, 424 Mich. 118, 131–134, 379 N.W.2d 49, 54–56 (1985).

In *People v. Thompson*, the defendant's first trial resulted in a jury verdict of guilty but was reversed due to improper jury instructions; the second trial resulted in a hung jury; and the third resulted in a conviction. Thompson claimed that retrying him following jury deadlock at his second trial violated the fundamental fairness principles of the due process clause. The court rejected that claim, holding that Thompson "received the full benefits of due process of law." *Id.* at 133, 379 N.W.2d at 55.

In *Ex Parte Anderson, supra,* the court rejected a capital defendant's challenge to the prosecution's fourth attempt to convict him. The three prior proceedings ended in mistrials because the respective juries were unable to agree on a verdict. Anderson claimed that a fourth trial would violate his due process rights.

The court engaged in a balancing test, weighing "the public's right to justice [against] ... the State's and the defendant's right to a final determination of the accusation." 457 So.2d at 445. Though it recognized "that a mistrial due to the inability of the jury to agree upon a verdict 'involves acute possibilities for prejudice to the defendant,'" *id.* (quoting Schulhofer, *Jeopardy and Mis-*

*trials*, 125 U.Pa.L.Rev. 449, 522 (1977)), the court noted that "[a] contrary ruling ... would 'subvert the public interest and permit a person, however guilty of serious crimes against society, to walk away unadjudicated, thereby reducing the detriment of punishment by increasing in a large measure the probabilities of escaping it.'" 457 So.2d at 445 (quoting *People v. Baker,* 70 Misc.2d 986, 991, 335 N.Y.S.2d 487, 492 (1972)). Moreover, the court in *Ex Parte Anderson* found that no "substantial and specifically identifiable prejudice" had resulted from the delay, because Anderson's chance of acquittal had not been hampered. 457 So.2d at 445.

Likewise, we can identify no substantial prejudice to Harris because the three prior penalty hearings were reversed on appeal. Balancing the interests of Harris, the State and the public, we find that a fourth penalty hearing will not violate Harris's due process rights.[8]

### III. *Unconstitutionality of Death Statute*

Harris argues that the Maryland Death Penalty statute is unconstitutional on its face and as applied. We have rejected this claim on several prior occasions. *See Mills v. State,* 310 Md. at 49–68, 527 A.2d at 10–20; *Booth v. State,* 306 Md. at 224, 507 A.2d at 1124, *vacated on other grounds,* 482 U.S. ——, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987); *Huffington v. State,* 304 Md. 559, 586–587, 500 A.2d 272, 286 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed. 2d 745 (1986); *Foster v. State,* 304 Md. 439, 471–480, 499 A.2d 1236, 1252–1257 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986). But we caution the trial court that it must instruct the jury in a manner consistent

---

**8.** We express no opinion as to the number of mistrials, appellate reversals, or *vacaturs* of sentence sufficient to constitute a bar to further proceedings under the United States Constitution's double jeopardy clause, eighth amendment, or due process clause or under Article 25 of the Maryland Declaration of Rights. The answer to this question ordinarily must depend on the particular circumstances of each case, as opposed to a simple aggregation of the number of prior proceedings.

with our decisions in *Foster, Mills,* and *Scott v. State,* 310 Md. 277, 281–291, 529 A.2d 340, 342–346 (1987).

IV. *Miscellaneous Guidance for the Trial Court*

The matters we now discuss need not be decided, since we vacate Harris's sentence. Nevertheless, because they may arise again, we consider them in order to provide guidance for the trial court.

A. Election of Jury Sentencing

In the proceedings below, the following dialogue occurred:

THE COURT: Mr. Harris, would you please stand.

THE COURT: Do you wish this proceeding to be conducted by a judge sitting alone or by a jury?

THE DEFENDANT: By a jury.

Harris "asserts that this litany was grossly insufficient [under Art. 27, § 413(b)(3) ] ... because he was never informed that a court sentencing could be advantageous because only one mind, and not 12, need be convinced" that mitigating factors are not outweighed by aggravating circumstances. Brief at 45. In short, Harris argues that his election of a jury sentencing (or conversely waiver of the right to a court sentencing) was not made knowingly and voluntarily.

Harris's assertion of ignorance is without basis, and for that reason, we need not and do not address his argument that he could not proceed to jury sentencing absent a full explanation of the difference between court and jury sentencing. In *Harris v. State,* 295 Md. 329, 455 A.2d 979 (1983) (*Harris I*), Harris argued that his waiver of the right to jury sentencing was not knowing and voluntary because the trial judge gave him the mistaken impression that in order to obtain a life sentence, he needed to convince 12 jurors that the death sentence was inappropriate. We agreed and vacated the sentence. 295 Md. at 338–340 & n. 1, 455 A.2d at 984 & n. 1. In so doing we carefully explained jury sentencing procedures and, by clear implication, court sentencing procedures. *Id.* In view of this,

Harris cannot be heard to claim ignorance, especially since before the sentencing hearing in the case before us, he actually participated in a court sentencing, as well as a jury sentencing.

██ Moreover, the very point that Harris now asserts— that a court sentencing could be more advantageous because he would have to convince only a single mind that mitigating factors are not outweighed by aggravating factors—is incorrect. As we said in *Harris I,* a single juror hold-out would result in a life sentence. *Id.* at 339, 455 A.2d at 984. *See also Mills,* 310 Md. at 54–55, 527 A.2d at 13. Whether the sentencing is by court or jury, only a single mind need be convinced that a life sentence is appropriate in order to achieve that outcome.

### B. Inflammatory Photos

Harris further asserts that the trial court erred by admitting into evidence State's Exhibits 4 and 5, consisting of two color photographs of the victim taken shortly after he had been shot. Harris objected to admission of the photographs at the sentencing "because ... [they were] in color, ... inflammatory, [and] outrageous on their face." He claimed that they "could do much better with black and white."

In the words of Detective Ostendorp, the photographer, State's Exhibit 4 "[s]how[ed] the victim lying on his back with his head facing ... the entrance of the store ... [, amongst] broken pieces of glass ... [and] blood." State's Exhibit 5 according to Ostendorp depicted the victim "with blood about ... [his] face ... [,] torso and right hand ... [,] lying between the shelves which contained two shotguns and the cabinet which contained the handguns."

In *Mills v. State, supra,* 310 Md. at 43, 527 A.2d at 7, we said that "the admissibility of photographs turns upon a balancing of their probative value against their potential for prejudice, and that the application of this test is a matter committed to the discretion of the trial judge." *See, e.g., State v. Tichnell,* 306 Md. 428, 463, 509 A.2d 1179, 1197,

*cert. denied,* ⸺ U.S. ⸺, 107 S.Ct. 598, 93 L.Ed.2d 598 (1986); *Grandison v. State,* 305 Md. 685, 729–730, 506 A.2d 580, 602 (1986); *Johnson v. State,* 303 Md. 487, 502–504, 495 A.2d 1, 9 (1985), *cert. denied,* 474 U.S. 1093, 106 S.Ct. 868, 88 L.Ed.2d 907 (1986). Under this standard "[a] court's determination in this area will not be disturbed unless plainly arbitrary." *Mills,* 310 Md. at 43–44, 527 A.2d at 8 (quoting *Johnson v. State, supra,* 303 Md. at 502, 495 A.2d at 8).

In *Mills,* the defendant was charged with murdering his cell mate by stabbing him "six times in the chest and thirty-nine times in the back." 310 Md. at 39, 527 A.2d at 5. At the guilt phase of the trial the judge admitted, over Mills's objection, a color photograph "show[ing] the back of the victim with blood draining from stabbings scattered from the shoulders to the waist level." *Id.* at 41, 527 A.2d at 7. We concluded that the photo "was [un]likely to so distort the jury's deliberations that its admission was 'plainly arbitrary.'" *Id.* at 44, 527 A.2d at 8. As a basis for our conclusion, we noted that the defense had not offered a stipulation that the victim had been stabbed six times in the chest and thirty-nine times in the back; those were facts the State was entitled to prove. And following examination of the photograph, we did not find it to be "particularly gory or gruesome." *Id.* at 44–45, 527 A.2d at 8. In short we concluded that the photo's probative value on the issues of premeditation and provocation were not sufficiently outweighed by its potential for prejudice.

In *Mills* the photos were presented at the guilt phase of trial; here they were introduced at the sentencing phase. The standard for admissibility—probative value versus prejudicial effect—remains the same, but the weighing must be done with recognition that the sentencing phase implicates issues and concerns that are different from those which predominate at the trial on the merits.

In *Booth, supra,* 482 U.S. at ⸺ ⸺ ⸺, 107 S.Ct. at 2532–2536, 96 L.Ed.2d at 448–452, the Supreme Court addressed some of the concerns which are present during

sentencing. The Court noted that the jury's task at a capital sentencing is "to focus on the defendant as a 'uniquely individual human bein[g].'" 482 U.S. at ——, 107 S.Ct. at 2533, 96 L.Ed.2d at 449 (quoting *Woodson v. North Carolina, supra,* 428 U.S. at 304, 96 S.Ct. at 2990, 49 L.Ed.2d at 961). As we have already observed, the Court found that victim impact statements presenting the victim's family members' opinions and characterizations of the crimes injected an impermissible arbitrary component into the sentencing proceeding. In this regard Justice Powell explained that

> the formal *presentation of this information by the State can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant. As we have noted, any decision to impose the death sentence must "be, and appear to be, based on reason rather than caprice or emotion."* .... The admission of these emotionally-charged opinions as to what conclusions the jury should draw from the evidence clearly is inconsistent with the reasoned decision making we require in capital cases.

482 U.S. at ——, 107 S.Ct. at 2536, 96 L.Ed.2d at 452 (quoting *Gardner v. Florida,* 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393, 402 (1977) (plurality opinion of Stevens, Stewart and Powell, JJ.)) [emphasis supplied].

▮ Photographs of a murder victim, similarly, involve the potential for inflaming the sentencing jury and "divert[ing] it from deciding the case on the relevant evidence concerning the crime and the defendant." *Booth,* 482 U.S. at ——, 107 S.Ct. at 2536, 96 L.Ed.2d at 452. Therefore, the presiding judge at a capital sentencing proceeding must exercise his discretion with great caution when ruling on the admissibility of photographic evidence of the murder victim.

▮ We do not know whether the State will reoffer the photographs at Harris's resentencing, nor can we foresee

the circumstances under which they may be offered. When the sentencing jury is not the jury that heard the guilt stage of the proceedings, the evidence that is admissible at sentencing may differ from that which would be proper if a single jury heard both proceedings. *See Tichnell v. State,* 290 Md. 43, 427 A.2d 991 (1981). We can do no more at this point than direct the judge's attention to the principles we have discussed and charge him to exercise his discretion in light of them and of the circumstances before him.

## C. Rebuttal of Abandoned Mitigating Factor

At the sentencing hearing the State offered evidence showing that while Harris was incarcerated for the instant offenses, he attempted to escape from the Maryland Penitentiary. The prosecutor asserted that this evidence would tend to refute the mitigating factor contained in Md. Code (1982 Repl. Vol., 1987 Cum.Supp.), Art. 27, § 413(g)(7) ("It is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society"). Despite Harris's objection and his announced intention not to rely upon the § 413(g)(7) mitigating factor, the trial judge admitted the evidence. Harris concedes that the State may introduce evidence rebutting a mitigating factor before the defense raises the issue, but argues the State may not do so "when the defense announces in advance [as did Harris] that it will not generate the issue." Brief at 31.

*White v. State,* 300 Md. 719, 481 A.2d 201 (1984), *cert. denied,* 470 U.S. 1062, 105 S.Ct. 1779, 84 L.Ed.2d 837 (1985), was a case in which we held the State may properly introduce evidence of a capital defendant's future dangerousness whether or not the defendant has first introduced evidence on or argued the issue. 300 Md. at 740, 481 A.2d at 211. In *White,* we "noted that the mitigating circumstance of future dangerousness, along with all other mitigating circumstances, is in issue at the inception of the proceeding since the jury is bound to consider all statutorily prescribed [mitigating] factors." *Johnson v. State, supra,*

303 Md. at 530, 495 A.2d at 23 (discussing *White v. State,* 300 Md. at 740, 481 A.2d at 211). *Also see* Md. Code (1982 Repl. Vol., 1987 Cum.Supp.) Art. 27, § 413(g) (requiring the jury to consider whether any mitigating factors exist). Moreover, as we said in *White,* "[t]o say that the ... mitigating circumstance is not an issue ... unless the convicted capital murderer invokes it would lead to the absurd consequence that, absent affirmative evidence or argument from the defendant, the court could instruct a sentencing jury that it could not find this mitigating factor to apply." *White,* 300 Md. at 740, 481 A.2d at 211. Since the jury must consider all mitigating factors set forth in § 413(g) whether or not raised by the defense, the State is not precluded from introducing evidence to refute any one of them.

The lower court did not err in overruling Harris's objection and in admitting evidence of his attempted escape.

D. Exclusion of Sentences for Related Offenses

After Harris's guilty plea in *Harris I,* Judge DeWaters imposed the death sentence for Hviding's murder. As to related offenses to which Harris had also pled guilty, he imposed a concurrent 20 year sentence for the armed robbery of Hviding (subject to a merger proviso); a 15 year sentence, consecutive to the foregoing, for the armed robbery of George Lindley that had occurred during the same episode; and a five year sentence, consecutive to all the above, for use of a handgun in the commission of a crime of violence. Thus, at the conclusion of his first sentencing proceeding, Harris had been sentenced to death plus 20 years. *Harris I,* 295 Md. at 331, 455 A.2d at 980. Although Harris's death sentence was set aside, the other sentences remained.

At the sentencing proceeding now before us, the State proposed to offer into evidence the presentence report, as authorized by Md.Code (1982 Repl. Vol., 1987 Cum.Supp.) Art. 27, § 413(c)(iv). But the State planned to edit the report by eliminating from it the sentences imposed

for the related offenses. Over Harris's objection, the court admitted the report subject to the redaction proposed by the State. Harris now claims, among other things, that evidence of the sentences should have been permitted because it had a bearing on a statutory mitigating factor—the likelihood (or unlikelihood) that he would "engage in further criminal activity that would constitute a continuing threat to society." Art. 27, § 413(g)(7). He posits that the consecutive sentences might convince the jury that eventual release on parole would be far in the future; thus, a life sentence might be deemed appropriate punishment when coupled with the consecutive sentences. The State responds that the possibility of parole is simply irrelevant to a capital sentencing decision.

■■■ The State's argument is correct. In *Poole v. State,* 295 Md. 167, 197, 453 A.2d 1218, 1233 (1983), involving a capital sentencing proceeding, we held improper a reference to the possibility of parole because, as Judge Couch explained for the Court

> we believe this type of argument is likely to allow the jury to disregard its duty to determine aggravating and mitigating factors, and to then balance one against the other as required by ... Art. 27, § 413, before imposing the death penalty. Any consideration of the possibility of parole as such simply is irrelevant and obviously prejudicial; we cannot condone such argument.

Shortly thereafter we applied the ban against reference to the possibility of parole to defense efforts to use that information at capital sentencing. *Evans v. State,* 304 Md. 487, 529–530, 499 A.2d 1261, 1283–1284 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986). There Judge Eldridge, citing *Poole* (among other authorities), expressly rejected the argument that the possibility of parole is relevant to the § 413(g)(7) "future dangerousness" mitigating factor. For the Court he wrote: "In this connection, it should be pointed out that one might be likely to engage in criminal activity constituting a threat to those around him whether he is confined in a penal institution or is on

parole." 304 Md. at 530, 499 A.2d at 1283 [footnote omitted]. We have on numerous occasions reaffirmed the rule. *See, e.g., Bowers v. State*, 306 Md. 120, 151–153, 507 A.2d 1072, 1087–1089, *cert. denied*, —— U.S. ——, 107 S.Ct. 292, 93 L.Ed.2d 265 (1986). *And see Booth v. State, supra*, 306 Md. at 216–219, 507 A.2d at 1120–1122 (testimony of defense witness as to parole eligibility should have been excluded had proper objection been made).[9]

 But to concede the validity of the State's argument does not dispose of the issue. The robberies of which Harris was convicted were statutory aggravating factors. Art. 27, § 413(d)(10). A sentencer might consider as a mitigating factor (when weighing the possibility of a death sentence) the fact that Harris had been appropriately sentenced for those crimes. Moreover, a sentencing jury, aware of Harris's convictions for armed robbery and use of a handgun, but not being informed of any sentences for them, might conclude that Harris had not been sentenced. The juror might further conclude that the jury sentence was intended to apply to all the crimes committed by Harris during the Hviding episode. Such a conclusion might induce a harsher sentence, whereas awareness of existence and extent of the prior sentences could have a mitigating effect.

 A jury in a capital case does not engage in a mechanical tabulation of aggravating factors against mitigating factors. *Jones v. State*, 310 Md. 569, 601, 530 A.2d

---

9. Whether the punishment of life imprisonment without the possibility of parole, first authorized in capital cases by Ch. 237, Acts of 1987, will require reconsideration of the rule prohibiting reference to the possibility of parole at a capital sentencing proceeding is a question we leave for another day. The newly-authorized penalty is not applicable to Harris, since it cannot be imposed unless the State gives appropriate notice prior to trial. Art. 27, § 412(b). Because Harris's trial occurred long ago, the notice cannot be given. A resentencing proceeding is not a trial for purposes of § 412(b). *Tichnell v. State*, 297 Md. 432, 439, 468 A.2d 1, 4 (1983); *cert. denied*, 466 U.S. 993, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).

743, 758–759 (1987). The "Maryland capital punishment statute does not require the death sentence if the jury believes death to be inappropriate...." *Mills v. State, supra,* 310 Md. at 50, 527 A.2d at 11. "If the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances." *Foster v. State, supra,* 304 Md. at 475, 499 A.2d at 1254. We hold that the sentences imposed on Harris for robbery and handgun use during the Hviding incident could have helped the jurors, or some of them, to decide not to impose the death penalty. In this sense, these sentences were evidence of mitigating circumstances. They should not have been redacted from the presentence report.[10]

### E. Jury Instructions

Harris cites three reasons why the jury instructions were erroneous. First, he argues that the sentencing court did not instruct the jury pursuant to *Mills* and, therefore, the death penalty statute was applied in an unconstitutionally mandatory manner. Second, he claims that it denigrated his right of allocution. And finally, he asserts that the sentencing court misinstructed on his burden of proof. Whether Harris's first contention is correct is immaterial; we agree with Harris on the second claim of error; he is wrong as to the third.[11]

---

**10.** Our holding is consistent with that of *Eddings v. Oklahoma,* 455 U.S. 104, 110, 102 S.Ct. 869, 874, 71 L.Ed.2d 1, 8 (1982): the eighth and fourteenth amendments demand that the sentencer "not be precluded from considering, as a mitigating factor, any aspect of the defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence of less than death." *See also Lockett v. Ohio,* 438 U.S. 586, 604, 98 S.Ct. 2954, 2964, 57 L.Ed.2d 973, 990 (1978).

**11.** The third contention will not be discussed here. We disposed of it in n. 2, *supra.*

1. *Instructions on Imposition of Sentence* [12]

Since we vacate Harris's sentence, it is not necessary for us to consider the validity of the instructions of which he now complains. At the new sentencing proceeding, if a jury is used, new instructions will be required. These must, of course, comply with the principles Judge Eldridge explained for the Court in *Mills v. State, supra.*

■■■■■ What *Mills* contemplates is that: (1) each individual juror must weigh the aggravating factors and any mitigating factors that he or she finds persuasive, even if those mitigating factors do not command unanimous agreement, *Mills,* 310 Md. at 54–56, 527 A.2d at 13–14; (2) a mitigating factor upon which the jury is divided should not be answered "no" in the "Findings and Sentencing Determination" form, *id.* at 58, 527 A.2d at 15; and (3) " '[i]f the sentencing authority perceives anything relating to the defendant or the crime which causes it to believe that death may not be appropriate, it may treat such factor as a mitigating circumstance and decide that it outweighs the aggravating circumstances.' " *Id.* at 51, 527 A.2d at 11–12 (quoting *Foster,* 304 Md. at 475, 499 A.2d at 1254). To put the last proposition slightly differently, the judge should explain to the jury that a § 413(g)(8) mitigating factor is " 'anything relating to the defendant or to the crime which causes it [or any of its individual members] to believe that death may not be appropriate.' " *Mills,* 310 Md. at 51, 527 A.2d at 11 (quoting *Foster,* 304 Md. at 475, 499 A.2d at 1254). At resentencing, instructions should be given that are fully consistent with *Mills, Foster,* and *Scott v. State,* 310 Md. at 281–291, 529 A.2d at 342–346.[13]

---

**12.** In this and other portions of the opinion at which we discuss sentencing procedures and considerations, we intimate no views whatsoever on any aspect of the sentence of life imprisonment without parole authorized by Ch. 237, Acts of 1987. *See* n. 9, *supra.*

**13.** With respect to possible deficiencies in the "Findings and Sentencing Determination" form used in this case, it was slightly different from that used in *Mills.* No detailed comparison is required, how-

## 2. *Instructions Regarding Allocution*

The lower court instructed the jury as follows concerning Harris's right of allocution:

> A Defendant has a common law right of allocution, i.e., to address the sentencing body in mitigation of punishment, however, his statement in allocution is not evidence or testimony. During allocution the Defendant is not under oath, and thus not subject to the penalties of perjury and to cross-examination.
>
> Any statement Jackie Harris makes to you should not be regarded as evidence but rather as his statement in mitigation of punishment.

Harris argues that the trial judge through this instruction denigrated his right of allocution. We agree.

In *Booth v. State*, 306 Md. at 199, 507 A.2d at 1112, we held that it was permissible for the prosecutor, in argument, to contrast unsworn allocution with "the elevated level of evidence which is sworn testimony subject to cross-examination." We also said that "[b]ecause the content of a convicted defendant's allocution may be considered by the jury or court in mitigation, the State, as a matter of nonconstitutional Maryland law, may comment on that allocution and urge its rejection by arguments which may include attacking the defendant's credibility by explicit reference to the lack of an oath and to the lack of testing by cross-examination." *Id.*

The instruction now before us referred to those matters, but it in effect told the jury that it should disregard any facts stated during allocution, because those facts were not evidence or testimony. This is so because the sentencing jury was previously instructed that it was "to decide the case only on ... evidence." *Booth* makes it

---

ever, nor need we discuss any purported deficiencies. Following *Mills* and *Jones* we issued an emergency Rules Order that, among other things, promulgated a new form as part of Md. Rule 4–343. 14 Md.Reg. at 1855–1858 (14 August 1987). At resentencing, the new form will be used, implemented by appropriate instructions.

plain that the credibility of what is said at allocution may be questioned, but *Booth* makes it equally plain that statements made at allocution may not be disregarded merely because they are not under oath. Because the instruction told the jurors they should not heed the latter precept, it was improper.

### F. Order of Argument

Closing arguments were made following testimony by the last defense witness and Harris's allocution. The State presented argument first and the defense followed. After the defense concluded its argument, the court, over Harris's objection, permitted the State to present rebuttal argument. Harris contends that since he bore the burden of proof as to a critical issue, *i.e.*, the presence of mitigating factors, he should have been given the last word at closing argument.

In support of his position, Harris points out that there was only one aggravating circumstance: the fact that the murder took place during the commission of a felony. Harris argues that since he conceded this point, the critical determination at sentencing involved the existence of mitigating factors, as to which he bore the burden of proof. Therefore, he contends, since a failure on his part to sustain the burden of proof meant mandatory imposition of the death penalty, he bore the ultimate burden of proof and should have been allowed to close argument. We disagree.

The general rule in Maryland is that the party holding the "affirmative of the issue ... has the right to begin and reply, both in the introduction of evidence and in the argument to the jury." *Kenly v. Washington County R.R. Co.*, 129 Md. 1, 6, 98 A. 232, 234 (1916). In more contemporary terms we might say that one factor bearing on which side should have the advantage of opening and closing argument is which party has the burden of persuasion. 5 L. McLain, Maryland Practice: *Maryland Evidence*, § 300.2 (1987) (hereinafter McLain). The burden of persuasion "refers to the standard of proof by which a party must satisfy the fact-finder in order to win a verdict...." McLain, *supra*, § 300.1 at 132. The

burden of persuasion is one of three elements which together make up the burden of proof. The other two are the burden of pleading ("the allocation between parties as to who must plead what in order to (1) avoid an adverse judgment on the pleadings and (2) make an issue a proper subject of proof at trial") and the burden of production ("the allocation between parties as to who must come forward with evidence in order to avoid an adverse judgment at the close of the evidence"). *Id. Cf. Commodities Reserve Corp. v. Belt's Wharf,* 310 Md. 365, 368 n. 2, 529 A.2d 822, 823 n. 2 (1987).

 Putting aside the burden of pleading, which is not at issue here, it is clear that in a criminal case the prosecution ordinarily bears the burden of persuasion and the burden of production and thus usually has "the right to the first and last word in the trial." McLain, § 300.2 at 139. This is also true at a capital sentencing proceeding.

The imposition of a death sentence involves a three-step process. First, the sentencing authority must find that at least one aggravating circumstance has been proved beyond a reasonable doubt. As to aggravating circumstances the State bears the risk of both nonproduction and nonpersuasion. *See* § 413(f) and *Tichnell v. State,* 287 Md. 695, 730, 415 A.2d 830, 848 (1980). "The second step requires the sentencing authority to consider whether, by a preponderance of the evidence, a mitigating circumstance exists." *Id. See also* § 413(g) and *Stebbing v. State,* 299 Md. 331, 361, 473 A.2d 903, 918, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984). Finally, the prosecution is assigned the burden of persuading the jury, by a preponderance of the evidence, that the aggravating circumstances outweigh the mitigating circumstances. *See* § 413(h) and *Tichnell,* 287 Md. at 730, 415 A.2d at 848–849.

 It is true that in *Stebbing* we said that the defendant has the burden of "proving ... the existence of a mitigating circumstance." 299 Md. at 361, 473 A.2d at 918. But what we meant by this was that the State is not required to prove the non-existence of mitigating circum-

stances. *Tichnell*, 287 Md. at 730, 415 A.2d at 848. Harris is incorrect in insisting that he had, in the traditional sense, the "burden of proof" as to mitigating circumstances. Although he had the risk of nonproduction and of nonpersuasion, a court could not have directed the jury to find against him on this issue, even if he produced no specific evidence at all, and even if he failed to argue it.

> [R]egardless of what evidence a defendant himself may or may not produce, or regardless of any mitigation argument he may or may not advance, if the jury perceives from the case a fact or circumstance concerning the crime or the defendant, which the jury deems to be mitigating, it may treat it as such. As to mitigation, it is only the risk of nonproduction or nonpersuasion which the defendant bears.

*Foster v. State*, 304 Md. at 474, 499 A.2d at 1254.

■ The short of it is that at a capital sentencing proceeding the State has the ultimate burden of persuading the jury to impose a death sentence. *See* McLain, § 300.6 ("Of course the prosecution will bear the burden of persuasion of proof of guilt beyond a reasonable doubt"). Thus, under the normal Maryland rule, the State was entitled to open and close.

JUDGMENT OF THE CIRCUIT COURT FOR HARFORD COUNTY IMPOSING A DEATH SENTENCE VACATED. CASE REMANDED TO THAT COURT FOR A NEW SENTENCING PROCEEDING IN CONFORMITY WITH THIS OPINION. COSTS TO BE PAID BY BALTIMORE COUNTY.[14]

Concurring opinion by COLE, J.

Concurring opinion by McAULIFFE, J., in which BLACKWELL, J., joins in Part I only.

---

**14.** This case originated in the Circuit Court for Baltimore County, but was later removed to the Circuit Court for Harford County, where the most recent sentencing proceeding was held. Costs, nevertheless, are to be paid by Baltimore County. Md. Rule 882 f.

COLE, Judge, concurring.

I concur in the judgment vacating the death penalty. However, I do not agree with the majority's reasoning in Part IV D of the opinion.

The majority holds that the new sentencer should be able to consider Harris's robbery and related sentences as mitigating factors when weighing the possibility of a death sentence. I disagree.

It is impossible to divine the judge's rationale for imposing the specific sentences and the new sentencer should not be influenced as to the appropriateness of the death penalty based upon the disposition the judge made in the other related crimes.

I believe the new sentencing jury should be in substantially the same situation as the old sentencing jury. Stated another way, the evidence produced before the new sentencer should be evidence that would have been admissible in the first sentencing proceeding or evidence of misconduct (otherwise admissible) that occurred subsequent to the former proceeding. As I see it, the sentences for the related crimes for which the defendant is on trial are irrelevant to the death sentence procedure as having no additional bearing on the facts of the crime or the defendant's character, prior record, or redemptive qualities. The jury already knows of the conduct leading to his convictions and the introduction of these sentences can only confuse and distract the jury.

In *Johnson v. State,* 303 Md. 487, 495 A.2d 1 (1985), this Court recognized the United States Supreme Court's teachings that

a proper death penalty statute confines and directs the jury's attention "to the circumstances of the particular crime and to 'the characteristics of the person who committed the crime.' "

303 Md. at 527, 495 A.2d at 21, quoting *Eddings v. Oklahoma,* 455 U.S. 104, 111, 102 S.Ct. 869, 875, 71 L.Ed.2d 1, 9 (1982). Instead of confining the jury's attention to the

circumstances of the crime and the defendant's characteristics, allowing evidence of Harris's robbery and related sentences improperly focuses the jury's attention upon how the trial judge thought the defendant should be punished.

In sum, to allow the sentencing jury to draw any inference from the robbery and related sentences is to approve an entirely unpredictable and conjectural process, which is the antithesis of the well-reasoned decision-making process required of a death penalty proceeding. In a death sentencing procedure the defendant should be protected against his own frustration. Therefore, to ensure fairness, the defendant should not be allowed to introduce this disconcerting evidence into the jury's deliberative process.

McAULIFFE, Judge, concurring in part and concurring in judgment.

BLACKWELL, Judge, joins in Part I only.

I concur in the result, but write separately to express my disagreement with part IV–D (Exclusion of Sentences for Related Offenses) and with the dictum relating to a defendant's burden of proof which appears in part IV–F (Order of Argument).

## I.

In part IV–D, the majority states that evidence of sentences imposed upon Harris for related offenses should have been placed before the jury, not because of the relevance such information might have to the issue of future dangerousness, but because 1) a juror might find as a mitigating factor that Harris had been "appropriately sentenced" for those crimes, and 2) unless informed of the sentence that had been imposed, a jury might conclude that the sentence it was to determine for the murder was required to apply to all the crimes committed during the criminal episode. Neither, in my judgment, is a valid ground for admitting this evidence.

As to the first ground, what is to happen if the jury concludes that the sentence for a related offense is unduly lenient? May we then expect the jury to "heavy-up" on the murder sentence to compensate? Furthermore, if the question of the appropriateness of the sentence for related offenses is to be placed before the jury, should not the jury be given all the relevant sentencing information that pertained to those crimes, including the amount of loss and extent of injury to the victims, and perhaps other victim impact evidence properly considered by the sentencing judge but never placed before the first jury? Rather than involve the jurors in the determination of a collateral issue pertaining to the "appropriateness" of a sentence meted out for some other offenses, I would focus their attention upon the real issue before them—the appropriate sanctions for the murders committed by this defendant.

With respect to the second ground, I am at a loss to understand the genesis of what I consider to be a rather fanciful notion that, unless a juror is told of the specific sentence imposed for a related crime the juror will assume that the sentence for murder must be sufficiently harsh to embrace all related offenses. I believe it much more likely that jurors understand there are separate punishments for separate crimes. If there is any real concern that jurors would be confused about that, the answer is to explain the general principle, and further explain that the responsibility of sentencing for those crimes lies with the judge. If the hypothetical problem conjured up by the majority has any substance at all, it is readily dispatched without the necessity of informing the jury of the specific sentence imposed.

Another problem should be noted. What is the judge to tell the next sentencing jury concerning the sentence already imposed? The effect of the original sentence was to impose 20 years imprisonment concurrent with, and 20 years consecutive to, the sentence for murder. However, the stipulation that 20 years of the sentence should be consecutive to the sentence for murder is no longer effective. The sentence for murder will be vacated by our

mandate, and the determination of whether a new sentence for murder will be consecutive to any part of the existing sentence is one that presumably may be made by the trial judge. *DePietrantonio v. State,* 61 Md.App. 528, 532, 487 A.2d 676, *cert. denied,* 303 Md. 295, 493 P.2d 349 (1985). It would be incorrect, then, to instruct the jury that any part of the earlier sentence will be consecutive to the sentence the jury determines. Also, how is the trial judge to explain the significance of a sentence that is consecutive to a life sentence, without explaining the impact upon the parole eligibility date? See *Davis v. State,* 312 Md. 172, 175, n. 4 539 A.2d. 218, 219, n. 4 (1988). I am of the opinion that the potential for confusion inherent in informing the jury of the previous sentence significantly outweighs the remote possibility of relevance posited by the majority.

## II.

I also disagree with the majority's conclusion that the facts and the law as they relate to the possibility of parole are irrelevant to a capital sentencing decision. Our capital punishment statute specifically sets forth as a possible mitigating circumstance that "[i]t is unlikely that the defendant will engage in further criminal activity that would constitute a continuing threat to society." Maryland Code, Art. 27, § 413(g)(7) (1957, 1987 Repl. Vol.). Proper consideration of this potential mitigating circumstance necessarily requires a reasoned prediction of future behavior, and as the Supreme Court has pointed out, the difficulty of that task does not excuse its performance.

It is, of course, not easy to predict future behavior. The fact that such a determination is difficult, however, does not mean that it cannot be made. Indeed, prediction of future criminal conduct is an essential element in many of the decisions rendered throughout our criminal justice system.... And any sentencing authority must predict a convicted person's probable future conduct when it en-

gages in the process of determining what punishment to impose.... The task that a [capital sentencing] jury must perform in answering the statutory question in issue is thus basically no different from the task performed countless times each day throughout the American system of criminal justice. What is essential is that the jury have before it all possible relevant information about the individual defendant whose fate it must determine. *Jurek v. Texas,* 428 U.S. 262, 274–76, 96 S.Ct. 2950 [2957–58], 49 L.Ed.2d 929 (1976).

Predicting how long a defendant given a life sentence will remain in prison could be an integral part of predicting whether that defendant will ever again constitute a danger to society. Even assuming that the word "society" was intended to include the prison population, an assumption I do not concede, jurors may well conclude, as do sentencing judges, that some persons adjust well to institutional surroundings and are unlikely to pose a threat while so confined. Jurors may also be expected to factor in the age of a defendant, and, if the jurors are given the *probable* time of actual incarceration, they will be in a much better position to predict whether the defendant is likely to constitute a threat to society when released. If "society" as used in this statute means society of persons outside of prison, as is the popular connotation of the word, it becomes even more important to provide the jurors with useful information that will assist them in predicting when the prisoner will be released into society.

Predicting when a person convicted of capital murder and sentenced to life imprisonment will likely be released on parole involves consideration of matters of law as well as fact. Section 4–607 of Art. 41 of the Code (1957, 1986 Repl. Vol., 1987 Cum.Supp.) provides that a person sentenced to life imprisonment as a result of a capital murder sentencing proceeding is not eligible for parole consideration until that person has served 25 years (or its equivalent after allowance for credits permitted by statute), and cannot in any event be paroled without the approval of the Governor.

This is a matter of law about which the jurors charged with the duty of considering future dangerousness should be instructed. I believe the average juror is unaware of the intricacies of parole eligibility law, and is more likely to have been exposed to the generally apocryphal stories concerning murderers who were released on parole within a year or two of their convictions. Ordinarily, we are not reluctant about sharing with the jury the true state of the law, and we should have no reticence in this area.

In addition to information concerning the law, there is factual information that could significantly assist a jury in determining the probable time when a given prisoner will be granted parole. The Division of Parole and Probation has its own set of guidelines for parole consideration, as well as an extensive data base compiled from past parole experience. A person with sufficient education, training, or experience in this field, given pertinent information concerning the background and sentence of the defendant, should be able to state an opinion expressed in terms of reasonable probability concerning the likelihood of parole for that individual. While certainty cannot be achieved, probability can, and a well-grounded opinion expressing the probability of parole could be of considerable assistance to a jury grappling with this critical mitigating circumstance.

The problem of what to tell a jury about parole is likely to become even more acute now that the Legislature has added, in certain capital cases, the option of imprisonment for life without the possibility of parole. To instruct jurors that there are three sentencing options—death, life without parole, and life—is to instruct them that "life" carries with it the possibility of parole. In my judgment, the defendant is entitled to have the jury instructed on the significant limitations that the Legislature has placed upon the possibility of parole in this type of case.

As authority for a complete ban on information relating to the possibility or probability of parole, the majority cites *Evans v. State,* 304 Md. 487, 499 A.2d 1261 (1985), *cert. denied,* 478 U.S. 3310, 106 S.Ct. 3310, 92 L.Ed.2d 722 (1986).

*Evans,* in turn, relies largely upon *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983), and *Poole* relies upon *Shoemaker v. State,* 228 Md. 462, 180 A.2d 682 (1962). *Shoemaker,* I submit, is not authority for excluding from a capital sentencing proceeding all evidence relating to parole.

*Shoemaker* involved the argument of a prosecutor to a jury at the guilt-innocence stage of a rape trial. The prosecutor, after informing the jury that the defendant could not be sentenced to more than 20 years if the jury followed the prosecutor's recommendation and found the defendant guilty "without capital punishment," proceeded to argue that the defendant could be released on parole after serving only one-third of whatever sentence was imposed, or earlier. Our predecessors reversed the conviction, finding the "chief vice" of the parole argument was that "it suggested to the jury that it might in part shift its responsibility for a finding of the defendant's guilt to some other body," *Shoemaker, supra,* at 469, 180 A.2d 682, and noting as well the absence of any evidence to support the prosecutor's argument. I am in full agreement with the decision reached in *Shoemaker.* The prosecutor was improperly using the suggestion of early parole to make it easier for the jury to convict. That is a far cry, however, from the use of competent evidence concerning parole, or an accurate statement of law as it relates to parole, in the sentencing phase of a capital murder case.

*Poole* applied the rule of *Shoemaker,* complete with the rationale of improper shifting of the responsibility for a finding of guilt, even though the argument concerning parole was made at the sentencing stage of a bifurcated capital case, after guilt had been determined. On the facts of *Poole,* the Court's condemnation of the prosecutor's argument may have been correct, but its reliance on *Shoemaker* was misplaced.

*Evans,* 304 Md. at 529–30, 499 A.2d 1261, followed *Poole* and *Shoemaker,* and added the thought that a person might be as likely to engage in criminal activity constituting a threat to those around him whether confined in a criminal

institution or on parole. I disagree. A juror certainly may find that a person constitutes no threat to society while confined, but would constitute a threat if released too soon. Knowledge of the law governing parole, and the availability of competent opinions properly grounded and based upon probabilities, would contribute to the jurors' understanding of when parole in any given case might be likely. Factoring this information into the mix of other relevant information, including the age of the defendant and the defendant's prior institutional history, would assist the jury in determining whether the particular defendant was likely to be a threat to society in the future.

### III.

With respect to part IV–F of the majority opinion, I agree that, because the State bears the ultimate burden of proof in a capital sentencing proceeding, it is appropriate to afford the State the right to open and close in final argument. I disagree, however, with the suggestion that Harris did not have the burden of proof on the issue of the existence of mitigating circumstances. He did. In *Stebbing v. State,* 299 Md. 331, 361, 473 A.2d 903, *cert. denied,* 469 U.S. 900, 105 S.Ct. 276, 83 L.Ed.2d 212 (1984), this Court said that "[i]t is the accused's burden to prove, by a preponderance of the evidence, the existence of a mitigating circumstance." In *Foster v. State,* 304 Md. 439, 474, 499 A.2d 1236 (1985), *cert. denied,* 478 U.S. 1010, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986), this Court acknowledged that, as to mitigation, the defendant bears the risk of nonproduction or nonpersuasion. The majority agrees with that statement from *Foster,* but says that this is not the same as having the burden of proof. I cannot agree. I view "risk of nonpersuasion" and "burden of persuasion" as correlative terms. See *Evans v. State, supra,* 304 Md. at 543 (McAuliffe, J., concurring and dissenting); 9 Wigmore, *Evidence,* § 2485 (Chadbourn rev. 1981); *McCormick on Evidence* § 336, n. 4 (E. Cleary 3d ed. 1984). A burden of persuasion is a burden of proof. In *Huffington v. State,* 304 Md. 559,

500 A.2d 272 (1985), *cert. denied,* 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986), this Court was quite explicit about who had the burden of proof on the question of the existence of mitigating circumstances:

> In the case at bar Huffington failed to carry his burden concerning proof of the mitigating factor that Hudson participated in the acts causing his death. 304 Md. at 583, 500 A.2d 272.

The majority is correct in noting that evidence of mitigating circumstances may come from evidence presented by the State, or by the defendant, or both. Moreover, because the range of circumstances which a juror could find to be mitigating is very broad, I agree that it would never be appropriate for the trial judge to instruct a jury that a defendant has failed to prove the existence of all mitigating circumstances as a matter of law. We need not shrink from the obvious, however, or engage in semantic gymnastics. There is nothing wrong with placing the burden of proof of the existence of mitigating circumstances upon a defendant. *Patterson v. New York,* 432 U.S. 197, 97 S.Ct. 2319, 53 L.Ed.2d 281 (1977). The General Assembly did precisely that, and we should not hesitate to say so.